[Cite as *Zanotti v. Ohio Dept. of Transp.*, 2011-Ohio-1402.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

LUCIANO ZANOTTI, et al.

      Plaintiffs

      v.

OHIO DEPARTMENT OF TRANSPORTATION, et al.

      Defendants
      Case No. 2009-07229

Judge Alan C. Travis
Magistrate Anderson M. Renick

MAGISTRATE DECISION

{¶ 1} Plaintiffs bring this action alleging negligence and loss of consortium. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} This case arises as a result of an accident that occurred when plaintiff[1] and three friends traveled through southeast Ohio on a motorcycle tour. Plaintiff, Bruno Casadei, Doug Darke, and Ron Vander Meulen visited Ohio over Labor Day weekend in 2007 to attend a motorcycle rally in Chillicothe. On the morning of September 2, the group traversed State Route (SR) 284 southeast of Zanesville. Casadei was the first rider in the group followed by Darke, Vander Meulen, and plaintiff, who was aboard a 2007 Harley Davidson touring bike.

{¶ 3} As the group rode along SR 284 in Meigs Township, they approached a hill. As plaintiff ascended the hill and began to negotiate a curve in the roadway, he

---

[1]"Plaintiff" shall be used to refer to Luciano Zanotti throughout this decision. "Defendant" shall be used to refer to Ohio Department of Transportation (ODOT).

encountered a "distressed" area of pavement, lost control of his motorcycle, and was thrown to the ground.  Casadei and Darke did not see plaintiff's crash, but Vander Meulen saw plaintiff fall to the ground and stopped to assist him.  When Casadei and Darke realized that the two men were not behind them, they turned around to find that plaintiff had crashed his motorcycle.  Plaintiff sustained a head injury as a result of the crash and he was taken to Good Samaritan Hospital for emergency medical treatment. He was later transferred to Grant Medical Center in Columbus, Ohio, where he stayed for eight days before being discharged to his home in Michigan.

{¶ 4}  In order for plaintiffs to prevail upon their claim of negligence, they must prove by a preponderance of the evidence that defendant owed them a duty, that defendant's acts or omissions resulted in a breach of that duty, and that the breach proximately caused plaintiff's injuries.  *Armstrong v. Best Buy Company, Inc.*, 99 Ohio St.3d 79, 81, 2003-Ohio-2573, citing *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77.  Defendant has a general duty to maintain its highways in a reasonably safe condition for the traveling public.  *Knickel v. Dept. of Transportation* (1976), 49 Ohio App.2d 335.  However, defendant is not an insurer of the safety of its highways.  See *Rhodus v. Ohio Dept. of Trans.* (1990), 67 Ohio App.3d 723.

{¶ 5}  Plaintiff contends that defendant breached a duty of care owed to the traveling public by failing to repair the distressed patch in the road.  Defendant first contends that the distressed portion of the roadway was not unreasonably dangerous and did not create a hazard to motorists.  Defendant argues, in the alternative, that even if the roadway did create a hazard, plaintiff failed to prove that such hazard caused the crash.

{¶ 6}  Phil Valentine, a transportation manager for defendant, testified that he was in charge of maintenance of the section of SR 284 where plaintiff's accident occurred.  Valentine admitted that he and his employees were aware of the defect in question and that they had been monitoring the condition of the roadway since 2007.

Valentine testified that the defect was minor and that defendant never considered it to be a safety hazard. He acknowledged that the area was patched in November 2008 in order to prevent it from becoming a safety hazard during the winter.

{¶ 7} David Ray has worked for defendant for 25 years and currently holds the position of State Maintenance Engineer. His staff navigate every mile of road in the state highway system to record deficiencies and plan repairs. Based upon photographs of the area taken approximately one year prior to the accident, photographs taken by the Ohio State Highway Patrol on the day of the crash, and Ray's visit to the scene at some point after the accident, he related that the alleged defect consisted of cracking in an area of pavement that had been previously patched. In Ray's opinion, the area of roadway at issue was neither in a hazardous condition at the time of the accident nor was it in need of repair.

{¶ 8} Plaintiffs' expert, Keith Bergman, is a licensed professional engineer. Bergman reviewed the traffic crash report and photographs taken by the Ohio State Highway Patrol, and he visited the accident site the day before trial. Based on his review of the photographs taken at the accident scene, he estimated that there was an elevation difference of approximately three to six inches on the defective area of road. Bergman testified that the defect in the road on the date of plaintiff's accident was 150 to 160 feet in length, and he described the defect as extending from the travel lane into the shoulder of the road. Bergman opined that the defect was caused by a lack of stability in the lower layers of roadway, which manifested over time on the surface of the road.

{¶ 9} Based upon the foregoing testimony and the court's own review of the photographic evidence admitted at trial, the court finds that the defect in the roadway on the day of the accident consisted of some cracked pavement and a slight depression in an area that had been previously patched; that the defect was located close to the berm; that the defect extended for approximately 150 feet from south to north as plaintiff traveled in a northerly direction; and that defendant had assessed the risk of harm

arising from this defect as minimal. Furthermore, the greater weight of the evidence convinces the court that the existence of such a defect on the date in question did not constitute an unreasonably dangerous condition on the roadway and that defendant's conduct in monitoring the condition of the road and the extent of the defect was within the accepted standard of care.  In short, defendant did not breach a duty of care owed to plaintiff when it elected not to repair the defect prior to plaintiff's accident.

{¶ 10} Defendant contends, in the alternative, that even if plaintiff had proven that the defect in the roadway created an unreasonably dangerous condition, plaintiff has not established that the defect caused his motorcycle accident.  At trial, plaintiff testified that when his front tire came in contact with the distressed area, his motorcycle began to "jimmy," which caused him to lose control.  Plaintiff denied that he applied the brakes too quickly as he tried to regain control, but that he did hit the brakes one to two seconds after he realized that he could not regain control.  According to plaintiff, the defect in the road was the worst he had ever seen.

{¶ 11} Plaintiff, however, admits that he sustained a blunt force head injury in the accident.  Medical records from Good Samaritan Hospital show that when plaintiff presented for emergency care, he was unable to remember what had happened to him. (Exhibit I.)  Medical records from Grant Medical Center demonstrate that even after plaintiff's transfer, he still had no recollection of the how the accident had happened. (Exhibit J.)

{¶ 12} Trooper Jennifer DeLong, the trooper who first responded to the accident scene, completed the traffic crash report and took measurements for the report based upon the marks that she saw on the road.  She testified that she and another trooper completed the sketch included in the report.  (Exhibit A.)

{¶ 13} Henry Lipian, defendants' expert in traffic accident reconstruction, examined the traffic crash report and the photographs taken at the scene but found no evidence of skid marks in the immediate area of the defect.  However, Lipian did

observe a skid mark that was 19 feet long and located approximately 120 feet north of the defect.  Lipian opined that the skid mark was made by the locked front tire of a motorcycle grinding on the pavement at what he identified as "Point A."

**{¶ 14}** Lipian also focused on metallic scrape marks shown in the photographs from the accident scene and located just north of the skid mark.  He concluded that these marks were made by plaintiff's motorcycle when it fell onto its side and slid down the roadway.  Lipian opined that plaintiff lost control of his motorcycle because he locked up the front wheel by engaging the brake too quickly when negotiating the right-hand curve.  It was his opinion that plaintiff's own negligence caused the motorcycle to fall onto its left side.

**{¶ 15}** According to Lipian, if plaintiff had truly lost control over the distressed area, the motorcycle would not have traveled as far as it did before coming to rest.  Based upon distances he estimated from reviewing the photographs and measurements taken at the scene by his staff, Lipian determined that the motorcycle was traveling at a minimum speed of 30 miles per hour when it reached point A.  Given an assumed perception/reaction time of 1.5 seconds, followed immediately by a hard break, Lipian concluded that plaintiff's motorcycle would require 104 feet to come to a full stop.  Lipian opined to a reasonable degree of reconstruction certainty that the distressed area was not a proximate cause of plaintiff's loss of control.  Instead, Lipian stated that the loss of control began at Point A, well past the defect in question.

**{¶ 16}** Even plaintiffs' own expert admitted, upon cross-examination, that there was no physical evidence to show that plaintiff rode over the distressed area before he crashed.  Bergman also acknowledged that a motorcycle experiencing difficulties such as those described by plaintiff would have left marks on the road, but that there were no such marks in the distressed area.  Bergman did not perform a speed calculation, did not take any measurements, and did not view the scene of the accident until the day before the trial.

**{¶ 17}** Bruno Casadei testified that he has known plaintiff for more than 20 years, and that he considers plaintiff to be a safe motorcyclist. Casadei testified that the group of men rode single-file about 75 yards apart from one another. He stated that when he saw the curve leading into the hill, he slowed down to 30 miles per hour. He did see the defect, but he did not travel over it because he rode near the center of the lane. Casadei stated that he did not see plaintiff lose control of his motorcycle, but that when he rode back to attend to plaintiff, plaintiff seemed disoriented. According to Casadei, he spoke with plaintiff on a number of occasions after plaintiff returned to Michigan, but that plaintiff was never able to remember what caused the accident.

**{¶ 18}** Because of the differing theories regarding the sequence of events and due to the absence of corroborating eyewitness testimony, the determination of whether the distressed road caused plaintiff's accident turns largely upon witness credibility. "In determining the issue of witness credibility, the court considers the appearance of each witness upon the stand; his manner of testifying; the reasonableness of the testimony; the opportunity he had to hear, see, and know the things about which he testified; his accuracy of memory; frankness or lack of it; intelligence, interest, and bias, if any; together with all facts and circumstances surrounding the testimony." *Adair v. Ohio Dept. of Rehab. & Corr.* (1998), 96 Ohio Misc.2d 8, 11; see also 1 Ohio Jury Instructions (1994), Section 5.30.

**{¶ 19}** Applying these criteria to the testimony presented herein, the court finds that plaintiff's description of the events was not credible. At trial, plaintiff claimed that he had a sound memory of the accident, yet the evidence shows that he could not remember what had happened even after he was released from the hospital. Moreover, while plaintiff claims that he lost control when his motorcycle contacted the distressed area, the physical evidence does not support his claim. Indeed, the skid mark was located far outside the distressed area and the final resting place of the motorcycle suggests that plaintiff lost control while navigating the curve. Taken as a whole, the

weight of the evidence convinces the court that plaintiff lost control of his motorcycle outside of the distressed area.  Thus, defendant's alleged failure to maintain the area was not a proximate cause of plaintiff's harm.

{¶ 20} For the foregoing reasons, the court finds that plaintiffs have failed to prove negligence by the preponderance of the evidence and, accordingly, judgment is recommended in favor of defendants.

*A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i).  If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed.  A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law*

*under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*


_____
ANDERSON M. RENICK
Magistrate

cc:

James P. Dinsmore                           R. Craig McLaughlin
Paula Luna Paoletti                         6105 Parkland Blvd.
Peter E. DeMarco                            Mayfield Heights, Ohio 44124
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

JSM/cmd
Filed February 11, 2011

To S.C. reporter March 22, 2011